McCARTNEY vs. HUBBELL.

*April 23 — May 10, 1881.*

CONTRACTS: EVIDENCE. *(1-3) When A. bound by contract of B. and C.: Evidence in such case.*

COURT AND JURY. *(4) Their respective parts in fixing damages, in case of a special verdict.*

CONSOLIDATING ACTIONS. *(5) When court may order actions consolidated.*

1. By the terms of their contract, C. was to sell chattels to B., and B. was to pay him therefor by an order for goods on A. and a promissory note to be executed by A. to C. *Held,* that, as the contract does not appear on its face to have been made on A.'s behalf or for his benefit, his mere *approval* of it created no liability on his part; but the question still was, whether, before such contract was made between B. and C., he promised to pay C., and whether the contract was made and the property delivered by C. to B. in reliance upon that promise.

2. If A., in such a case, actually sells and delivers goods to C. in part payment of the amount due the latter from B. by the terms of said contract, he cannot recover the value of such goods from C.; and the fact of such sale and delivery as such payment is evidence for the jury upon the question of A.'s alleged prior promise to pay C. the whole value of the property delivered by C. to B.

3. Declarations made by A. to a witness, some time after the contract between B. and C., to the effect that A. was to pay C. for the property

delivered to B., are not admissible in evidence against him, except for the sole purpose of impeaching his contrary testimony.

4. It is error for the court to render judgment for larger damages than are found by the jury in its special verdict, where the right of the party to the additional damages is not clear as a matter of law from other facts duly found by the jury.

5. There was no error against defendant in consolidating two actions against him by the same plaintiff, for goods sold, in one of which plaintiff sued as surviving partner and in the other in his individual name; the same defenses and counterclaims being available in both. *Lawrence, Adm'r, v. Vilas*, 20 Wis., 381; R. S., sec. 2792.

APPEAL from the Circuit Court for *Taylor* County.

The case is thus stated by Mr. Justice TAYLOR:

" *McCartney* brought two actions in justice's court against *Hubbell* to recover for two bills of goods sold and delivered to the latter. In the first action he claimed as surviving partner of the late firm of McCartney & Whelan, ·and in the second action in his own right. *Hubbell* denied his liability in both actions, and alleged that the goods sold and delivered to him by the plaintiff were sold upon the credit of one Dennis Needham, and were received by said *Hubbell* in part payment for certain pine timber sold by him to the said Needham and *McCartney;* and, by way of counterclaim, he further answered as follows: 'That plaintiff is indebted to this defendant in the sum of $550, by reason of the aforesaid agreement with said Needham and plaintiff, for that the said Needham did, in the fall of 1877, purchase of and from this defendant, on account of said plaintiff, a large quantity of pine saw-logs and · timber, of the value of $650; and, in addition to the aforesaid goods, wares and merchandise, did promise to pay this defendant the bankable and negotiable commercial paper of and made by said plaintiff, to become due June 10, 1878; that plaintiff took and received said logs and timber of and from said Need-, ham well knowing the said promises, and the said plaintiff did agree thereto; that by reason thereof defendant permitted said plaintiff to take said logs and timber, as aforesaid, without

taking legal steps to enforce the payment therefor; that prior to said June 10, 1878, defendant demanded of and from said Needham, and of and from said plaintiff, to give said paper to defendant as aforesaid, which was refused; that no part of said sum has been paid except the goods in the complaint mentioned; that in making the aforesaid agreement, said Needham acted for and on behalf of said plaintiff, and with the full knowledge and approval of said plaintiff, and was in that behalf the agent of said plaintiff; and that said plaintiff did fully ratify and confirm said agreement.'

" *McCartney* denied the allegations of the counterclaim. He recovered in the justice's court, and the defendant appealed both cases to the circuit court. In that court, upon motion of the defendant, the actions were ordered to be consolidated, and they were so consolidated, and tried as one action. The making of this order is assigned as error by the plaintiff upon this appeal.

"Upon the trial in the circuit court, there was no dispute as to the amount due the plaintiff upon his accounts for goods sold. The contest was upon the defendant's alleged counterclaim. As evidence tending to prove his counterclaim, the defendant offered in evidence, against the objection of the plaintiff, a contract in writing between himself and Dennis Needham, of which the following is a copy:

"'This agreement, made and entered into this 20th day of November, 1877, by and between *S. B. Hubbell*, of Medford, Taylor county, Wisconsin, party of the first part, and Dennis Needham, of the same place, of the second part, witnesseth: The said party of the first part, for and in consideration of the covenants and agreements of the party of the second part hereinafter mentioned, does hereby sell, transfer and assign unto the said party of the second part all the pine timber either lying, standing or growing on the following described tract or parcel of land, to wit: the N. W. of the N. W., and the S. ½ of the N. W., and the N. ½ of the S. W., of section

34, township 32 N., of range 1 E. (Also the pine timber on the Lewis Brown homestead, and on the Henry Nelson homestead.) And does also give the second party the right to cut any and all logging roads (of reasonable width) necessary to get at and haul said pine timber; said timber to be logged off and removed by said second party during the logging season of 1877 and 1878. In consideration whereof, the said party of the second part hereby agrees to pay the said party of the first part the sum of $650, in manner following, to wit: the sum of $150 by an order for goods on *David McCartney*, of said village of Medford, aforesaid, payable at his store on or before January 1, 1878; the balance, being the sum of $500, to be paid on or before April 5, 1878, in good negotiable and bankable paper or securities, drawn by *David McCartney* and becoming due June 15, 1878. This agreement is binding on the heirs and legal representatives of the respective parties hereto.

" ' In witness whereof said parties have hereunto set their hands and seals the day and year above written.

" ' S. B. HUBBELL,

" ' DENNIS W. NEEDHAM.'

" The defendant himself testified, upon his direct examination, 'I went to *McCartney*, the plaintiff, — can't tell the exact day, but either the latter part of October or the first of November, — and *Mr. McCartney* told me that he had made arrangements with *Mr. Needham to purchase all of his timber from him*, and that I must go and see him '; ' went from him to see Needham, — that was about the first of November; went directly to Needham, or within a few days.' Further along in his testimony he says: ' I told Needham that *McCartney* would not purchase anything, and that I would have to sell it to him.' He was then shown the contract, a copy of which is given above, and he said: ' This is the contract that I finally consummated with Mr. Needham.' He further testified that he and Needham were two or three weeks

in consummating the trade, and that before the contract was drawn he went down to *McCartney* and told him what Needham had said, and what he was willing to offer, and *McCartney* replied, 'You can't have any money before the 15th of June;' that at this time he did not fully explain the provision of the contract in reference to the payments. He further testified that he wanted to settle in his mind whether *McCartney* would pay on the 15th of June; that he had a talk with *McCartney*, and told him Needham was going to buy the timber; that Needham had made him offers for the pine, and that he was to pay him in an order for timber for Morley, some time in the winter, and pay the balance on the 15th of June; that *McCartney* was to pay it; and *McCartney* made the statement that he could not have any money before the 15th, but that he could have all the goods he wanted. He and Needham then made the contract, and a day or two before it was signed he went to *McCartney's* office and handed him the contract, and as *McCartney* could not see to read it, for want of his glasses, he read it to him, and when he came to the point where Needham agrees to pay on the 15th [5th] of April, *McCartney* stepped up and said: 'No; I didn't agree to pay on the 15th of April; I agreed to pay on the 15th of June;' that he then reread it to him, and stated that Needham had agreed to give him his paper on the 15th of April, payable on the 15th of June. He then said to *McCartney*, 'Suppose we want a hundred dollars' worth of goods?' *McCartney* replied, 'Well, that is all right; that is the way I make my living, by selling goods.' He replied, laughing, 'I guess I won't get any more goods than I want.' The defendant said this is all the direct conversation he ever had with *McCartney* about this contract with Needham. He further testifies that he afterwards gave Morley an order for lumber, and *McCartney* let him have the lumber, and that he afterwards found that Morley had got more than $150 on his order, and he, defendant, said to *McCartney*, 'That is all right, I

suppose, if we take more goods than that?' *McCartney* ·replied, 'that I could have all the goods I wanted to take; that if I would take it in goods he would have so much less money to pay in the spring; that it was all right, we could go on.' He also swears that at the time the note was to be given he demanded that it should be from Dennis Needham and *McCartney* — from both of them. On his cross examination, the defendant testified that Needham took all the logs that were mentioned in the contract, but about 50,000 feet; that the logs were all marked with *McCartney's* stamp; and that he had since sold the timber which Needham did not take. He also says: '*McCartney* never made any offer to me for the timber. I am positive about that. In reality, I sold my pine to *McCartney*. Made no entry in my books. I looked to *McCartney* for my pay for this pine all the time. He agreed *to pay me as I have testified, and became responsible for paying it.* I never asked Mr. Needham for the pay for those logs.' He admits that upon the advice of counsel, after *McCartney* refused to pay, he attempted to put a lien on these logs. He says again: 'I looked to *McCartney* because he put in the logs, or they were put in by him. I tried to sell my pine to *McCartney*, and he sent me to Needham. He said that Needham was to buy the pine and supply the mill the next summer, and that I must go to him and make arrangements with him, and I did so. *I supposed that it was between Needham and me that the contract was drawn. I did not swear that Mr. Needham told me that he had authority to buy those logs from me for* McCartney, *as his agent. I swore that Mr. Needham told me that he had authority from* McCartney *to guaranty the payment of money at such times and in such goods, and I went to see if it was so, and asked* McCartney, *and he said it was all right.'* The foregoing is the strongest statement of the case in favor of the defendant, and his other testimony does not strengthen the case so made.

"*McCartney* denies all the material statements made by the defendant, and swears that he never knew there was a contract between the defendant and Needham until on the trial in the justice court; that if he ever knew there was such a contract, he had forgotten it; that the goods sold were charged to the defendant at the time they were sold, and not to Needham; and that he understood that some of the logs he purchased of Needham, he (Needham) got of defendant. Needham swears that he signed the contract with the defendant, and made it in his own behalf; that he purchased the timber from defendant for himself, and had no authority to act for *McCartney*."

There was a special verdict, as follows:

"1. Q. Did the defendant and Dennis Needham, on the 20th day of November, 1877, execute the annexed contract or writing marked 'Ex. A'? A. Yes. 2. Q. Before or at the time of the execution of said contract, did the plaintiff and Dennis Needham have any bargain between them by which plaintiff was to obtain the said timber from Needham? A. Yes. 3. Q. Did plaintiff authorize said Needham to make the promises of payment in store goods and negotiable paper or securities of said plaintiff as specified in said contract, 'Ex. A,' before said Needham did so promise? A. Yes. 4. Q. If to the last question you answer 'Yes,' then were the goods, for which *McCartney* now sues, got by *Hubbell* to apply on said contract with Needham, 'Ex. A'? A. Yes. 5. Q. Did *Hubbell* inform *McCartney* before said contract, 'Ex. A', was signed, of the terms of said contract? A. Yes. 6. Q. Did *McCartney*, when so informed, lead *Hubbell* to believe, by language and conduct, that Needham had authority to make said contract, and that he, *McCartney*, would furnish *Hubbell* the goods and negotiable paper or securities provided for in the contract? A. Yes. 7. Q. Did *Hubbell* execute said contract with Needham, relying upon *McCartney's* aforesaid promises? A. Yes. 8. Q. Did *McCartney* know, at the

McCartney vs. Hubbell.

time of his bargain to get the logs from Needham, that Needham had promised to pay *Hubbell* in manner specified in said contract 'Ex. A'? A. Yes. 9. Q. After *McCartney* had notice of the contents of said contract, 'Ex. A,' how much did he pay Needham? A. $2,000. 10. Q. Did Needham purchase the timber mentioned in said contract as the agent of *McCartney?* A. Yes. 11. Q. Has the balance of the purchase price of said timber, specified in said contract, 'Ex. A,' ever been paid to *Hubbell* by either Needham or *McCartney?* A. No. 12. Q. What is the amount of goods got by *Hubbell* from *McCartney?* A. $280.51, which includes interest to date, February 4, 1880. 13. Q. What amount is now due *Hubbell* upon said contract? A. $245. 14. Q. Did *McCartney*, when informed of the terms of said contract, 'Ex. A,' ratify and assent to the same? A. Yes.

A motion by plaintiff for a new trial was denied. On defendant's motion, so much of the special verdict as found the amount due the defendant from the plaintiff upon the contract to be $245, was amended so as to substitute the sum of $441.58, "for the reason that the undisputed testimony given on the trial showed, and the special verdict shows," that the latter was the amount really due defendant if he was entitled to recover any sum whatever. From a judgment pursuant to the verdict as thus modified, the plaintiff appealed.

*John K. Parish*, for the appellant.

The cause was submitted for the respondent on the briefs of *Walter R. Barnes*.

TAYLOR, J. From an examination of the verdict it is apparent that the case was submitted to the jury upon the theory that the defendant had produced evidence on his part which would justify the jury in finding that the contract between Needham and the defendant was, in fact, a contract between the defendant and *McCartney;* that Needham made the contract as the agent of *McCartney*, and for *McCartney's* bene-

fit, and with his assent. We think this was an erroneous theory. Admitting the truth of all the statements made by the defendant in his evidence, they do not tend to prove that the contract was the contract of *McCartney*. He swears himself, substantially, that Needham did not tell him that he had any authority to buy the logs for *McCartney*, as his agent, and the whole evidence tends to prove there was no such agency on the part of Needham. All the defendant pretends to claim is, that *McCartney* sanctioned the promise in the contract with Needham that he (Needham) should pay for the logs by an order for $150 of goods on *McCartney*, payable at his store, and that the balance should be paid in good negotiable and bankable paper or securities drawn by *McCartney* and becoming due June 15, 1878.

If the defendant can recover at all of *McCartney* for the value of the timber sold to Needham, it must be upon the theory that he made the contract with Needham upon the strength of a promise made by *McCartney*, before the contract was signed, that if he sold the timber to Needham, he *(McCartney)* would pay for it at the times and in the manner stated in the contract; that is, he would accept the order for $150, payable in goods, and give his negotiable notes for the balance on the 15th [5th] day of April, payable on the 15th of June. This the defendant insists *McCartney* did promise and agree to; and he bases his authority for so testifying upon what he alleges to be a fact, viz., that before he would sign the contract with Needham he saw *McCartney*, and read over the contract to him in his office, and that after hearing the contract read *McCartney* said it was all right. The defendant, in his counterclaim, so alleges. He says that plaintiff took the logs and timber from Needham (not from the defendant) knowing how he (Needham) had promised to pay for them, and that plaintiff agreed thereto, and on account thereof he (defendant) permitted the plaintiff to take the timber without taking legal steps to enforce the payment therefor. The whole case, con-

sidered in its most favorable aspect for the defendant, amounts only to this: that *McCartney*, before the contract was made between the defendant and Needham, orally promised the defendant that if he made the contract with Needham as proposed, he *(McCartney)* would make the payment to the defendant promised by Needham at the times and in the manner set out in the written contract between them. There is nothing in the written contract between the defendant and Needham which tends to show that the title to the timber should vest in *McCartney*. Clearly the title to the timber under the contract vested in Needham when it was cut; and if it ever became vested in *McCartney*, it must have been by virtue of a separate and independent contract made between *McCartney* and Needham.

We find little evidence in the case which justified the court in submitting to the jury the third question, and none to justify the submission of the tenth, viz.: "Did Needham purchase the timber mentioned in said contract as agent of *McCartney?*" Nor is there any evidence which will sustain the affirmative answer to such question. The evidence in the case justified the submission to the jury for a special verdict of the first, second, fourth, fifth, sixth, seventh and eighth questions, only modifying the fourth question by omitting the reference to the third, and striking from the sixth question the words, "that Needham had authority to make such contract and." The affirmative answers to these questions might be supported notwithstanding the conflict of evidence in the case; and it would then become a pure question of law, whether, upon such verdict, the defendant would be entitled to recover against the plaintiff upon his counterclaim. It would then raise the point whether the plaintiff's promise was a promise to answer for the debt, default or miscarriage of another, and therefore void under the statute, or whether it was an original promise on the part of the plaintiff to pay the defendant the sum mentioned in the contract with Needham,

in case the defendant made the contract with him as contemplated, and permitted him to take the timber.   The validity of this promise on the part of *McCartney* — if there was one, — would depend very much upon the question whether the defendant delivered the timber to Needham relying solely upon the promise of *McCartney* to pay for the same, and not on the promise of Needham to pay as promised in his contract; or, in other words, whether the timber was delivered solely on the strength of the promise made by *McCartney*.   In this view of the case, it would not be sufficient on the part of the defendant to show that the plaintiff *(McCartney)* knew of the terms of the contract before it was signed and the timber delivered, and that he *(McCartney)* did not dissent from its provisions, or approve of its provisions; but he would be compelled to show that there was a promise on the part of *McCartney*, in express terms or by clear implication, that he would pay the defendant for the timber as stated in the contract, if he delivered it to Needham; and, in addition, that the defendant did deliver the timber to Needham thereafter, relying solely upon such promise of the plaintiff.

The mere approval of a contract by one person made between other parties, not on its face appearing to have been made on behalf or for the benefit of the person so approving of the same, would create no liability on the part of such person. This case, we think, must turn upon the questions whether the plaintiff promised the defendant, before he made the contract with Needham, and before he delivered the timber, that, if he made the contract and delivered the timber, he (plaintiff) would pay defendant therefor; and whether the contract was afterwards made, and the timber delivered, relying upon such promise.

Without looking into the charge of the court, which is not made a part of this record, we think it apparent, from the questions submitted to the jury for a special verdict, that this view of the case was not properly submitted for their consider-

ation; and for that reason the judgment should be reversed. In order to enable the defendant to recover damages against the plaintiff upon his counterclaim, he must bring himself within the rule established by this court in the case of *Champion v. Doty*, 31 Wis., 190. This rule would not apply as to his defense to the plaintiff's claim for goods sold. Although the plaintiff was not legally bound to let the defendant have the goods upon the Needham contract, still, if the jury found they were sold and delivered to the defendant in part payment of the amount due the defendant from Needham, the plaintiff could not recover their value of defendant in this action. What will amount to a defense against the claim of plaintiff for the goods sold is by no means a sufficient ground to enable the defendant to recover upon his counterclaim. The fact, however, that plaintiff did deliver the goods to the defendant on the Needham contract (if he did so deliver them), would be competent evidence upon the question of the promise to pay the whole sum to become due to the defendant for the timber delivered.

We think the court erred in permitting the witness Keeler to testify to a conversation he had with Dennis Needham, and to state what Needham said he had told *McCartney* in a conversation had with *McCartney* some time after the contract had been made between Needham and defendant. The object of this conversation was to show that *McCartney*, in that conversation with Needham, had admitted he was to pay the defendant for the timber. This was certainly a very material point for the defendant to make out, and we know of no rule of law which would justify his proving it by showing that Needham had said such was the fact. This was the very essence of the contest between the parties, and in the conflict of evidence on that point it might have had great weight with the jury. It may be urged that this evidence was admitted to impeach the testimony of Needham upon that point by showing that his statement made to the witness differed from that

made by him on the trial. But it does not appear that the evidence was offered for that purpose solely, nor does it clearly appear that any foundation was laid in the examination of Needham for the introduction of such impeaching evidence. Under the circumstances the jury might well have understood that the testimony was admitted and received as tending to show that *McCartney* had in fact promised to pay the defendant for the timber. For that purpose the evidence was clearly incompetent, and should have been ruled out on the objection of the plaintiff.

We are also of the opinion that the court erred in rendering judgment for a larger amount of damages than the jury awarded by their verdict. The jury, by their special verdict, apparently based their verdict as to damages upon the value of the timber which was actually received by the plaintiff, and which was taken from the lands of the defendant by Needham under his contract, instead of giving the whole contract price mentioned in the contract. By examining the special verdict, it will be seen that the amount of the value of the goods received by the defendant, added to the amount of the damages allowed by the jury, is about $525, the sum claimed by the defendant as due him for the timber taken from his land at the time he filed his petition for a lien upon the timber. The jury may have taken this claim of the defendant, as to the amount due, as the true amount, notwithstanding the contract called for more. It appeared from the evidence that a part of the timber was not taken, and still remained on the defendant's land. The defendant not having made any claim, when he filed his lien, for the value of the timber not taken, the jury had the right to limit the damages to the value of the timber actually taken. Again, the jury may have based their verdict for damages against the plaintiff, over and above the value of the goods received by the defendant, in part and perhaps wholly upon the ground that the plaintiff had in fact received the timber, and might have refused to give any verdict for damages, had

McCartney vs. Hubbell.

they been instructed that if they gave the defendant damages they must give damages for the whole sum agreed to be paid by Needham in his contract with the defendant. The right of the defendant, upon the facts found by the special verdict, to have the whole contract price, notwithstanding the timber never came to the possession of the plaintiff, and was not removed from the lands of the defendant, is not so clear as to justify the court in ordering judgment in favor of the defendant for a greater amount of damages than was awarded by the verdict of the jury.

We do not think there was any error in consolidating the two actions. The action brought by the plaintiff as surviving partner was in fact an action brought in his own right as much as the second action, which was brought in his name as an individual. Under the decisions of the courts, the defendant could make the same defenses by way of counterclaim and set-off to the one action as to the other. In *Lawrence v. Vilas*, 20 Wis., 381, Chief Justice Dixon says that, "to a demand by a surviving partner, who sues as such, the defendant may set off a debt due him from such survivor individually; and, *vice versa*, a debt due to a defendant as surviving partner may be set off against a demand on him in his own right." The same rule was established in *Slipper v. Stidstone*, 5 Term R., 493; *French v. Andrade*, 6 Term R., 582; *Smith v. Barrow*, 2 Term R., 476; *Holbrook v. Lackey*, 13 Met., 132. We cannot see how the plaintiff could be prejudiced by the consolidation of the two actions. The defendant's counterclaim was just as available to the defendant in the one action as the other, and it would seem that it was a benefit rather than an injury to have but one trial. The actions were clearly subject to consolidation under the provisions of the statute, section 2792. The plaintiff could undoubtedly have joined the two causes of action in the same action. See Story on Partnership (6th ed.), § 346; *Strauss v. Houghton*, 38 Vt., 583; *Holbrook v. Lackey*,

13 Met., 132, 134; *Hancock v. Haywood*, 3 Term R., 433; *Stafford v. Gold*, 9 Pick., 533.

For the reasons before stated the judgment must be reversed.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial.